573 F.2d 827
 UNITED STATES of America
v.
Louis Charles BOSCIA, Appellant in No. 77-1029.
UNITED STATES of America
v.
James D. POTTER, M. C., Appellant in No. 77-1206.
UNITED STATES of America
v.
Anthony CRIVELLI, Sr., Appellant in No. 77-1300.
UNITED STATES of America
v.
Bernard L. SHAPIRO, D. D. S., Appellant in No. 77-1301.
UNITED STATES of America
v.
Albert David MILANI, D.C., Appellant in No. 77-1302.
UNITED STATES of America
v.
Robert Louis PLUSQUELLEC, Appellant in No. 77-1092.
UNITED STATES of America
v.
Louis Anthony DeSANTIS, Appellant in No. 77-1093.
UNITED STATES of America
v.
Paul Nicholas SCOLIERI, Appellant in No. 77-1174.
UNITED STATES of America
v.
Louis D. ADAMS, Appellant in No. 77-1282.
 Nos. 77-1029, 77-1092, 77-1093, 77-1174, 77-1206, 77-1282,
77-1300, 77-1301 and 77-1302.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 5, 1978.
Decided March 10, 1978.
Certiorari Denied May 15, 1978.
See 98 S.Ct. 2248.
 
 Blair A. Griffith, U.S. Atty., David M. Curry, First Asst. U.S. Atty., Pittsburgh, Pa., for appellee.
 William A. Goyette, Pittsburgh, Pa., for appellant, Robert Louis Plusquellec.
 Leonard A. Costa, Pittsburgh, Pa., for appellant, Louis Anthony DeSantis.
 John J. Dean, Pittsburgh, Pa., for appellant, Louis Charles Boscia.
 Stanley M. Stein, Pittsburgh, Pa., for appellant, James D. Potter.
 Samuel J. Orr, IV, Beaver, Pa., for appellant, Anthony Crivelli, Sr.
 James K. O'Malley, Pittsburgh, Pa., for appellant, Bernard L. Shapiro, D.D.S.
 Paul N. Scolieri, pro se.
 Thomas A. Livingston, Pittsburgh, Pa., for appellant, Albert Milani.
 Irving M. Green, New Kensington, Pa., for appellant, Louis D. Adams.
 Before ROSENN, and HIGGINBOTHAM, Circuit Judges, and BARLOW, District Judge.*
 OPINION OF THE COURT
 HIGGINBOTHAM, Circuit Judge.
 
 
 1
 Defendants Louis Boscia, Robert Plusquellec, Paul Scolieri, Louis DeSantis, James Potter, Albert Milani, Bernard Shapiro, Anthony Crivelli and Louis Adams are appealing convictions on charges of violating the federal mail fraud statute, 18 U.S.C. § 1341 (1970) and of conspiring to commit mail fraud in violation of the federal conspiracy statute, 18 U.S.C. § 371 (1970). The convictions are affirmed.
 
 
 2
 Defendant Elias Yurick, an osteopath, was acquitted at trial. The proceedings against defendant Jack Pincus, a physician, were severed when his attorney's wife became ill shortly before trial. The charges against defendant Pincus have now been dropped. Kenneth Ferris pled guilty to conspiracy charges and testified for the prosecution. Joseph Iezzi was convicted at trial and has not appealed. Thomas Cherubin, an unindicted co-conspirator, was given a grant of immunity and testified for the prosecution.
 
 
 3
 Evidence supporting the following facts was presented to the jury. The jury's verdict is consistent with their finding these facts.[1]
 
 
 4
 In August of 1973, pursuant to a scheme developed by Boscia, Thomas Cherubin purchased an automobile casualty insurance policy from the St. Paul Mercury Insurance Company with money supplied by Boscia.
 
 
 5
 Boscia, Cherubin, Ferris, DeSantis, Scolieri and Plusquellec met on the evening of November 24, 1973 at a cocktail lounge in downtown Pittsburgh. A meeting the previous night had proven abortive. After the meeting, the conspirators searched for an accident site. In the early morning of November 25, 1973, Boscia intentionally drove Cherubin's Chevrolet Blazer into the rear of Scolieri's car which was stopped at an intersection in Allegheny County, Pennsylvania. Scolieri and his passengers, Ferris and Plusquellec, had vacated Scolieri's car before the accident. Boscia's passengers, Cherubin and DeSantis, had also vacated the Blazer prior to the collision. Afterwards, Cherubin reported the accident to the police. Boscia represented himself to be Iezzi.
 
 
 6
 False claims for personal injuries were submitted by Iezzi, Ferris, DeSantis, Scolieri and Plusquellec. These claims included false medical reports and bills for professional services by defendants Potter, a physician, Milani, a chiropractor, and Shapiro, a dentist. These claims also included a false car rental agreement provided by defendant Crivelli. These fraudulent claims were processed with the cooperation of defendant Adams, a claims supervisor for the insurance company, who made no substantial investigation of the claims despite instructions to do so from his superior.
 
 
 7
 The grounds of appeal are discussed below.
 
 1. EXTRANEOUS COMMUNICATIONS WITH JURORS
 
 8
 On October 14, 1976, in the midst of the trial, juror Patricia Boyle was excused because of the death of her boyfriend. That evening, at the request of defendant Boscia, but without the knowledge of any counsel or any other co-defendant, an investigator called Ms. Boyle to find out the name of her deceased boyfriend. Ms. Boyle told juror Pamela Perry of the phone call and Ms. Perry mentioned it to some other jurors. Ms. Boyle also informed the Court of the phone call. On October 18, 1976, while the jury was deliberating, Judge Marsh informed counsel for all parties of the call from the investigator to Ms. Boyle and announced his intention to interview her. The next day, Judge Marsh interviewed Ms. Boyle in camera and first learned that she had spoken with Ms. Perry. That same day, after the verdict, Judge Marsh interviewed Ms. Perry who told him that she had spoken of the call to jurors Latcheran and Deiger who were then interviewed on October 27, 1976. Juror Fagan was interviewed the next day when the judge was told that she had also heard of the call. The investigator who made the call was also interviewed.
 
 
 9
 All interviews were in camera and outside the presence of counsel. All persons interviewed were sworn at the commencement of the interviews, the interviews were transcribed and the transcripts were made available to counsel. Judge Marsh made specific findings on the basis of the interviews. He found that only juror Perry knew that the call to Ms. Boyle came from anyone associated with the defendants and that Ms. Perry was not prejudiced by her knowledge of the call.
 
 
 10
 Defendants claim that the communications from Ms. Boyle to Ms. Perry and from Ms. Perry to other jurors were so prejudicial as to require a new trial. They argue that there is prejudice because the jurors may have considered the call to Ms. Boyle harassing. Also, defendants claim that since the investigator identified himself as being from the defense and, since at least one juror was aware of that, the defendants were prejudiced by the implication that there was a joint defense which in turn supported the government's theory that the defendants had acted in collaboration. Defendants claim that the inquiry into the prejudicial communications was insufficient and that Judge Marsh abused his discretion in finding the communications not to be prejudicial.
 
 
 11
 Defendants rely heavily on the Remmer cases, Remmer v. U. S., 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954) (Remmer I) and Remmer v. U. S., 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956) (Remmer II), to support their claim that they are entitled to a full evidentiary hearing on the issue of prejudice including the right to cross-examine witnesses. In Remmer I, the Court stated:
 
 
 12
 In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant. Mattox v. United States, 146 U.S. 140, 148-150 (13 S.Ct. 50, 36 L.Ed. 917;); Wheaton v. United States, 8 Cir., 133 F.2d 522, 527 . . . The trial court should not decide and take final action ex parte on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate. 347 U.S. at 229-30, 74 S.Ct. at 450. (emphasis supplied)
 
 
 13
 A preliminary question is whether the private communications here were "about the matter pending before the jury." The matter pending before the jury is the guilt or innocence of the defendants. Defendants argue that the communications may have given the jurors the impression that the defendants were, as the prosecutor alleged, acting in collaboration and that they were harassing Ms. Boyle. Therefore, although they do not deal directly with guilt or innocence, when viewed in the light most favorable to the defendants' assignment of error, the communications are, arguably, though indirectly, "about the matter pending before the jury." For the sake of argument, therefore, we will treat them as "presumptively prejudicial."
 
 
 14
 We find, on the facts here, however, that the presumption has been rebutted and the trial judge's decision not to hold a more extensive evidentiary hearing is not reversible error. We note initially that the circumstances here are far different from those in Remmer. There, a friend of the defendant suggested to a juror that he "could make some easy money if he would make a deal" with the defendant. Remmer II, 350 U.S. at 378, 76 S.Ct. at 426. Thus, the communication dealt much more directly than those here with the ultimate issue of guilt or innocence. The likelihood of prejudice was increased by the F.B.I.'s interview of the juror prior to the verdict. Judge Marsh did not question the jurors here until after the verdict thus avoiding the pressures that might have been generated by a pre-verdict interview. In Remmer, defense counsel were given no notice of the incident until they learned about it in the press. Here counsel were given prompt notice of the call from the investigator to Ms. Boyle and of Judge Marsh's intention to interview Ms. Boyle. No defense counsel asked to be present or to participate in the questioning. Although counsel were not given prior notice of the interviews with the other jurors and the investigator, they were given a complete transcript of those interviews and, as mentioned, Judge Marsh made specific findings on the basis of the proceedings.
 
 
 15
 It is now well established that the failure to provide a full evidentiary hearing into possible prejudice resulting from communications with jurors does not, in itself, require a reversal or remand. See U. S. v. Spinella, 506 F.2d 426 (5th Cir. 1975), cert. denied, 423 U.S. 917, 96 S.Ct. 227, 46 L.Ed.2d 147 (1976) (Anonymous ambiguous phone calls made to two jurors; the trial judge questioned both, dismissed one, and spoke to panel as a whole); U. S. v. Larkin, 417 F.2d 617 (1st Cir. 1969), cert. denied, 397 U.S. 1027, 90 S.Ct. 1271, 25 L.Ed.2d 536 (1970) (failure to allow examination by defense counsel where no objections were made is, at most, harmless error); Allen v. U. S., 376 F.Supp. 1386 (E.D.Pa.1974), aff'd, 511 F.2d 1392 (3d Cir. 1975) (a juror was allegedly told by a friend of a co-defendant who was to be given a separate trial that the co-defendant was not at the site of the crime at the time in question; in the presence of counsel, the trial judge questioned the juror without cross-examination by counsel and thereafter dismissed the juror without examining the other jurors). That the trial judge has some discretion in determining the nature and extent of the hearing into possible prejudicial communications has been expressly recognized. U. S. v. Doe, 513 F.2d 709, 712 (1st Cir. 1975); U. S. v. Tillman, 406 F.2d 930, 938 (5th Cir.), vacated and remanded on other grounds as to one petitioner, cert. denied as to others, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969).
 
 
 16
 In this case, the inherent likelihood of prejudice arising from these communications was not great. The trial judge conducted a thorough and tactful investigation. Transcripts of the investigation were given to counsel. Detailed findings were made. In no case cited or found have procedures as thorough as these been found inadequate. We conclude, therefore, that the failure to allow cross-examination or other procedural safeguards, does not constitute reversible error under these circumstances.
 
 
 17
 Having decided that the hearing was adequate, we also uphold Judge Marsh's finding that the defendants were not prejudiced by the communications here. Such findings are not reversed unless they constitute an abuse of discretion. U. S. v. Burke, 496 F.2d 373, 377 (5th Cir. 1974). The record supports the finding that only one juror, Ms. Perry, knew the call came from someone associated with any defendant. Ms. Perry was emphatic in stating that she was not prejudiced against the defendants as a result of her knowledge of the call to Ms. Boyle. Any presumption of prejudice was adequately rebutted.
 
 2. SEVERANCE
 
 18
 Milani, DeSantis and Potter argue that the denial of motions for severance pursuant to Rule 14 of the Federal Rules of Criminal Procedure is ground for reversal. A trial judge's refusal to sever will not be reversed in the absence of an abuse of discretion. U. S. v. Somers, 496 F.2d 723, 730 (3d Cir.) cert. denied, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974).
 
 
 19
 All three defendants argue that refusal to sever deprived them of the ability to call co-defendants to testify in their behalf. In determining the necessity of severance under these circumstances, courts have placed emphasis on the following four factors: (1) the likelihood of co-defendant's testifying; (2) the degree to which such testimony would be exculpatory; (3) the degree to which the testifying co-defendants could be impeached; (4) judicial economy. See U. S. v. Rosa, 560 F.2d 149 (3d Cir. 1977) (in banc); U. S. v. Finkelstein, 526 F.2d 517 (2d Cir. 1975) cert. denied, sub nom. Scardino v. U. S., 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976); Byrd v. Wainwright, 428 F.2d 1017 (5th Cir. 1970).
 
 
 20
 Defendants have not made a strong showing of the likelihood that their co-defendants would testify. Milani's counsel represented orally to the court that he had spoken with co-defendants who had indicated a willingness to testify in Milani's behalf if there were separate trials. Counsel for Potter and DeSantis represented that they would call the co-defendants, but made no showing of their willingness to testify.
 
 
 21
 In U. S. v. Finkelstein, supra, severance was denied even though a co-defendant signed an affidavit stating that he would testify for appellant. Severance was denied there because the court found it unrealistic to believe that the co-defendant would not invoke his Fifth Amendment privilege as well as because the testimony would be cumulative. Bare assertions that co-defendants will testify are insufficient. See U. S. v. Tillman, supra.
 
 
 22
 The showing as to the exculpatory nature of the desired testimony is also weak. Potter specifies the need only for Boscia's testimony. Ferris and Boscia had met with Potter in Potter's office. Ferris testified that the discussion did not deal with his physical condition and that he was not examined by Potter. Potter testified that he had examined Ferris. There is no showing as to what Boscia would testify.
 
 
 23
 DeSantis claims the need for Milani's testimony concerning Milani's examination and diagnosis of DeSantis. DeSantis did call Dr. Glorioso to testify on essentially the same subject. DeSantis admits that Milani's testimony would be cumulative, but argues that the cumulative testimony would increase the likelihood that a reasonable doubt would be raised.
 
 
 24
 Milani claims that he would call all co-defendants to testify that they never had any arrangement or agreement with him to defraud any insurance company. As will be discussed with respect to Potter's conspiracy contention, whether Milani knew all the other conspirators is of little relevance and the evidence concerning the false bill from Milani is very substantial. Thus, the proposed testimony would not likely have been significantly exculpatory.
 
 
 25
 As Judge Marsh noted in his opinion Boscia, DeSantis and Yurick had previously been convicted on charges stemming from another fake accident. Therefore, they would be subject to damaging impeachment if called by another co-defendant.
 
 
 26
 Finally, in this case, considerations of judicial economy weigh heavily against separate trials. Of course, no defendant should ever be deprived of a fair trial because it is easier or more economical for the government to try several defendants in one trial rather than in protracted multiple trials. The goal of the judicial process is not to decide cases as quickly and as inexpensively as possible. But where there is a reasonable assurance that defendants will be given a fair trial regardless of whether a severance is granted, judicial economy becomes a relevant factor. This record reveals that, under Judge Marsh's meticulous, patient and thoughtful presiding, the defendants received a fair trial. It is within this context that we conclude that considerations of judicial economy weigh against the request for several trials.[2]
 
 
 27
 After considering all of these factors and the case law, we conclude that the refusal to sever was not an abuse of discretion.
 
 
 28
 Milani also argues that the refusal to sever was improper because the evidence against the other defendants prejudiced his case. Severance is not necessary as long as the jurors could judge the case against each defendant only on the basis of the evidence properly adducible against him. Tillman v. U. S., supra; U. S. v. Stitt, 380 F.Supp. 1172, 1176 (W.D.Pa.1974), aff'd,510 F.2d 971 (3d Cir.), cert. denied, 421 U.S. 962, 95 S.Ct. 1949, 44 L.Ed.2d 448 (1975). We conclude that the scheme here was not so complex nor the actors so numerous that the charges and evidence against each defendant could not be kept separate in the minds of jurors.
 
 3. BRADY MATERIALS
 
 29
 Milani claims that the district court's refusal to turn over, or at least, examine the Grand Jury testimony of witness Ferris violated his due process rights because of the possibility that the testimony might contain exculpatory evidence to which he was entitled pursuant to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We have examined that testimony in camera and find nothing even remotely exculpatory. See U. S. v. Dansker, 537 F.2d 40, 65 (3d Cir. 1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Our examination is not intended as a ruling that trial judges are obligated to read grand jury testimony every time counsel has a hunch that it may contain exculpatory evidence. The examination here was undertaken out of an abundance of caution.
 
 
 30
 Plusquellec has requested that this court review papers that the district court impounded after finding them not to be Brady material. We have reviewed these papers and we find that they were properly withheld from defense counsel.
 
 
 31
 4. KNOWLEDGE REQUIRED UNDER 18 U.S.C. § 1341
 
 18 U.S.C. § 1341 provides:
 
 32
 § 1341. Frauds and swindles.
 
 
 33
 Whoever, having devised or intended to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both. (emphasis supplied).
 
 
 34
 Milani argues that the government must prove actual knowledge on the part of the defendants that the mails would be used to further the fraudulent scheme. The jury was instructed that they could find the defendants guilty if the defendants could reasonably foresee that the mails would be used in the execution of the scheme. The trial judge's instructions were proper. In Pereira v. U. S., 347 U.S. 1, 8-9, 74 S.Ct. 358, 363, 98 L.Ed.2d 435 (1954), the Court stated, "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." Accord, U. S. v. Brown, 540 F.2d 364, 376 (8th Cir. 1976); U. S. v. Tiche, 424 F.Supp. 996, 1001 (W.D.Pa.), aff'd, 564 F.2d 90 (3d Cir. 1977).
 
 5. SCOPE OF THE CONSPIRACY
 
 35
 Potter claims the evidence was insufficient to convict him on the conspiracy charge. The indictment charges that thirteen defendants and an unindicted co-conspirator conspired to violate 18 U.S.C. § 1341 by fraudulently obtaining money from the St. Paul Mercury Insurance Company. The indictment charges further that the conspiracy consisted of faking the accident and submitting false claims. Potter argues that he cannot be convicted of this conspiracy since it was not proved that he knew anything about the faking of the accident or had anything to do with any conspirator other than Ferris and Boscia. Potter relies heavily on Kotteakos v. U. S., 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). This reliance is misplaced. In Kotteakos, a central figure arranged F.H.A. loans based on fraudulent applications for a number of people who had no relation to each other. Here, all the transactions were part of one scheme to defraud one insurance company by making false claims arising out of one faked accident. Potter was proved to have been well acquainted with Boscia who was the kingpin of the conspiracy. Potter had been entertained by Boscia on several occasions. Boscia was also present at the meeting where Potter claimed he examined Ferris and where Ferris denied any examination took place. Government Exhibit 7-D, a medical report signed by Potter, contains a history describing the accident. Potter testified that he had been told of the accident.
 
 
 36
 It was further proved that Potter knowingly submitted a false bill thereby knowingly contributing to the ultimate object of the conspiracy defrauding the insurance company. It was not necessary to prove that Potter knew all the details of the conspiracy or all of its participants. Blumenthal v. U. S., 332 U.S. 539, 556-57, 68 S.Ct. 248, 92 L.Ed. 154 (1947); U. S. v. James, 528 F.2d 999, 1011 (5th Cir. 1976). The evidence here was sufficient to sustain conviction on the conspiracy count as alleged.
 
 
 37
 We have carefully considered all of the other contentions of the defendants and find them without merit.[3]
 
 
 38
 For the foregoing reasons, the judgments of conviction will be affirmed.
 
 
 
 *
 United States District Judge for the District of New Jersey, sitting by designation
 
 
 [1]
 In his opinion, Judge Marsh, who presided at trial, noted these facts as being proved by "overwhelming evidence."
 
 
 [2]
 Originally, these defendants argued that since Pincus' case had already been severed, it would impose no greater burden for their cases to be severed and tried with Pincus'. At oral argument before this court, counsel for the government disclosed that the charges against Pincus stemming from the incident here had been dropped. If the trial judge had granted these motions solely in contemplation of Pincus' subsequent trial, his decision would have been based on a false premise. This is vivid illustration of the uncertainties that a trial judge must face in ruling on a severance motion. This is also an indication of the dangers presented by an appellate court's hindsight analysis of the circumstances surrounding such a motion
 
 
 [3]
 With respect to defendants' other contentions, we find:
 
 
 [1]
 The evidence was sufficient to support the convictions of all appellants on both the conspiracy and substantive counts
 
 
 [2]
 Jury instructions on the relevance of the car repair bill were proper and adequate
 
 
 [3]
 The district court did not err in denying Milani's motion to compel the government to seek immunity for Milani's co-defendants
 
 
 [4]
 The district court did not err in denying Milani's request for the production of certain Jencks material
 
 
 [5]
 The district court did not err in admitting the St. Paul Insurance Files, generally, and Government Exhibits 7-D and 7-E, specifically, into evidence
 
 
 [6]
 The district court did not err in admitting testimony derived from Milani's appointment book
 
 
 [7]
 The district court did not err in admitting the testimony of Cherubin as to statements made by Boscia and Scolieri and the cautionary instructions given with respect to this testimony were proper and adequate
 
 
 [8]
 The district court did not err in refusing to give instructions in accordance with Cool v. U. S., 409 U.S. 100, 93 S.Ct. 354, 34 L.Ed.2d 335 (1972)
 
 
 [9]
 The district court did not err in refusing to review grand jury transcripts to determine whether the indictments were based on adequate evidence
 
 
 [10]
 The district court did not err in admitting the statements of Iezzi and Milani through the testimony of Postal Inspector Trainor and the cautionary instructions given with respect to this testimony were proper and adequate
 
 
 [11]
 The failure to disclose material contained in Milani exhibits 1 and 2 was not a violation of Brady mandates
 
 
 [12]
 The district court did not err in allowing testimony concerning the alleged criminal activity of Boscia and the cautionary instructions given with respect to this testimony were proper and adequate