**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 18-1195 and 18-1493
_____

UNITED STATES OF AMERICA

v.

RENITA BLUNT,
Appellant


UNITED STATES OF AMERICA

v.

EARL LAFAYETTE HALL, III,
Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Crim. No. 1:16-cr-00050-001 and 002)
District Judge: Hon. Sylvia H. Rambo
_____

Argued on September 27, 2018
_____

Before: SMITH, *Chief Judge*, McKEE, and RESTREPO, *Circuit Judges*.

(Filed: July 12, 2019)

Jennifer P. Wilson [ARGUED]
227 High Street
P.O. Box 116
Duncannon, PA 17020
        *Counsel for Appellant Renita Blunt*

Ronald A. Krauss
Quin M. Sorenson [ARGUED]
Office of Federal Public Defender
100 Chestnut Street
Suite 306
Harrisburg, PA 17101
        *Counsel for Appellant Earl Hall*

Kim D. Daniel [ARGUED]
Office of the United States Attorney
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse
Harrisburg, PA 17108
        *Counsel for Appellee United States of America*

_____

OPINION OF THE COURT
_____

RESTREPO, *Circuit Judge*.

Before us is an uncommon situation in which two married criminal defendants—Earl Lafayette Hall, III, and Renita Blunt—seek to be re-tried separately so that they may each have an opportunity to present their cases without any unwarranted constraints on their trial rights. Because each of the defendants is entitled to a trial free of unfair prejudice, we will reverse the District Court's denial of each of their motions for severance—on grounds distinct to each defendant—and vacate Hall and Blunt's convictions and sentences.

## I.

Hall and Blunt were convicted of engaging in a scheme from January 2013 to June 2015 to collect unemployment compensation benefits from federal and state agencies by using the identities of military servicepeople. They were appointed separate defense counsel at the onset of their case, each of whom engaged in extensive motion practice at every stage of the trial proceedings. Because Hall and Blunt only challenge select motions rulings by the learned District Court, we will limit our review to those motions.

### A.     Pre-trial Motions

On November 9, 2016, the Government jointly charged Hall and Blunt with twelve counts of mail fraud, in violation of 18 U.S.C. § 1341; nine counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); six counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1); one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1349; and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).

Hall and Blunt, who had married in March 2016 prior to trial proceedings and remained married throughout the proceedings, each filed a motion for severance (each, a "Severance Motion") of their trials.

Blunt filed her Severance Motion on February 23, 2017. Hall App. 54. In support of her motion, she argued the following:

> Defendant Blunt is confronted with a dilemma: she wishes to provide exculpatory testimony on her own behalf at trial, but her testimony is likely to inculpate her husband, Defendant Hall. As a result, a joint trial will force her to choose between testifying on her own behalf, which testimony is likely to inculpate her husband, or not testifying at all in order to avoid testifying adversely to her husband.

*Id.* at 52. Blunt renewed her Severance Motion prior to jury selection.

In Hall's Severance Motion, he argued that "if Ms. Blunt testifies, it appears her testimony would seriously jeopardize Mr. Hall's right to a fair trial," and that "Ms. Blunt makes clear in her brief that if she testifies, her testimony is likely to inculpate her husband." *Id.* at 58 (internal citation and quotation marks omitted). He cited Blunt's Brief in Support of her Motion for Severance:

> Ms. Blunt will testify that Mr. Hall asked her to call the Pennsylvania Department of Labor and pretend to be Shawnta Williams (which is the name of one of the false unemployment

4

compensation claimants), and that she only did so after Mr. Hall coerced and threatened her into placing the call by telling her that he needed her to make the call or else he would be harmed. Mr. Hall told her that Williams was not a real person. She will testify that Mr. Hall told her what to say during the call, and he provided her with Williams' social security number and date of birth. She will testify that when she questioned Mr. Hall about the Williams phone call, he became angry and pushed her, resulting in her having a chipped tooth.

*Id.* at 59 (quoting Dist. Ct. Doc. No. 93, at 8). The District Court denied both Hall and Blunt's Severance Motions without a hearing. Instead, it stated only that it was adopting the reasoning set forth in the Government's response to both motions.

At a later pre-trial conference, Blunt made an oral motion for severance, stating that she was pursuing the motion on a new ground of "mutually antagonistic defenses . . . [namely,] that [Blunt] acted under duress." Blunt App. 67. The Government argued that the District Court had already considered the facts underlying Blunt's duress argument—the threat to compel Blunt's phone call, the chipped tooth—in denying the initial Severance Motion. The District Court did not respond on the record to Blunt's oral motion, but the trial proceeded.

## B.     Trial Testimony

Trial began on March 6, 2017. The Government attempted to prove Hall's involvement in the alleged scheme

5

through recorded telephone calls to public benefits offices. While most of the recorded calls were made from Blunt's cell phone, the Government claimed that Hall was actually the speaker on all calls but one.

This exception was a single call in which the speaker claimed to be Shawnta Williams. The Government claimed that the speaker was Blunt and that Hall could be heard in the background. At trial, a probation officer who had supervised Hall identified him as the caller in nearly all of the recordings. He also testified that he could hear Hall in the background of the Shawnta Williams call. Further, wire transfers entered into evidence showed that six checks made out to Shawnta Williams were deposited into Hall's checking account.

Blunt was the final witness to testify at the trial. She testified that Hall had access to her phone when the incriminating calls were made and that no one other than Hall used her phone. She also testified that Hall had used her phone to make calls to the Departments of Labor in Pennsylvania and Hawaii. Blunt also provided testimony emphasizing Hall's role as the instigator of the scheme compared to her role as a reluctant, and sometimes defiant, participant. In the first instance—when Blunt was asked if she reported Hall's activity to her probation officer—Hall objected. The following conversation ensued at sidebar:

> [HALL'S COUNSEL]: Your honor, I would object. . . . I believe [Blunt is] going to testify that she reported to her probation officer that Earl Hall was up to his old tricks or something to that effect. That is a clear reference to his prior convictions prior 404(b) bad acts that this court has specifically kept out.

6

> [BLUNT'S COUNSEL]: I can proffer that what my client and I prepared for her to testify to is that she made a report to the probation officer that she was concerned about his behavior and that he may be involved in illegal activity. I think this is significant for her defense because she's accused in this time period of being a coconspirator. . . . I think it's relevant to her state of mind the fact that she had an inkling that he might be doing something illegal and she reported it to her probation officer. It's probative of her state of mind and important to her defense.
>
> [HALL'S COUNSEL]: It's a hearsay statement against Mr. Earl, out of court statement, prejudicial, not relevant, and would not be admissible in a separate trial. I have to renew my motion to sever.
>
> THE COURT: Well, you're building up a good case, but I'll permit it, but that is the extent of it.

Hall App. 270. After this conversation, Blunt testified that she reported to her probation officer that "Earl had received a phone call from an unknown number. After that phone call he just was acting like frantic, like he was afraid of someone." *Id.* at 271. Her attorney also attempted to elicit testimony that Blunt planned on reporting her husband's activity to a federal special agent; however, the District Court limited her testimony to the statement that she planned to tell another person about her husband's activity.

Blunt then admitted that she pretended to be Shawnta Williams on one of the recorded phone calls and that she had initially refused Hall's multiple requests that she make the call. When she initially refused, Hall "seemed frustrated" and said

7

"there was going to be problems, and then he told me that if I didn't make this call that he was going to kill us." *Id.* at 272. She testified that she was convinced to make the call when Hall said that "people [were] going to bring harm to our family" and that they would "pretty much kill us." *Id.* She described Hall's demeanor during this exchange as "frustrated, agitated, and . . . angry." *Id.*

The Government also procured testimony from Blunt regarding her MagicJack account, a phone application that disguises the source of outgoing calls. After entering Blunt's phone records into evidence, the Government was able to identify the phone numbers called using Blunt's MagicJack account, including numbers belonging to the Pennsylvania Treasury Bureau of Unemployment Compensation Disbursements. Blunt confirmed that Hall had access to her phone and to the MagicJack account and stated that she had only made one of the many calls to the Treasury Bureau. This testimony implied that Hall made other calls on her MagicJack account. Blunt's counsel underscored Blunt's testimony against Hall in her closing statement, first with regard to the Williams call:

> [Blunt] told you that it was Mr. Hall who entered a number into an app on her phone. That app is called the MagicJack app. He typed in the number. She didn't know the number to call. She told you that he was there the whole time and he told her what to say. . . . Before a phone call was ever placed she told you there were several days in a row when she was being pressured by Mr. Hall to make a phone call . . . .

8

Blunt App. 879. Second, Blunt's counsel recounted Hall's threats:

> I think [Blunt] described his demeanor as frustrated and angry, and then it escalated, and after a couple of days of her saying no and him continuing to press on the issue, he tells her again with an excited, I think her word was angry, demeanor, "Look, we're in danger. There's something bigger going on here. If you do not make this call, our family will be harmed."

*Id.* Last, with respect to the phone calls, Blunt's counsel reminded the jury:

> She told you, "He used my phone all the time. Yes, it's my phone, but I gave it to him," maybe she shouldn't have, but she did. She testified very clearly, very firmly that the calls that were made to the Department of Labor other than June 25, 2014 were Mr. Hall. . . . The government *cannot prove otherwise*. Their witness said we can't say who made the calls.

*Id.* at 883 (emphasis added).

Ultimately, Hall was convicted of multiple counts of aggravated identity theft and conspiracy to commit mail fraud and was sentenced to a total term of imprisonment of 116 months. Blunt was convicted of one count each of aggravated identity theft and conspiracy to commit mail fraud and was sentenced to a total term of imprisonment of twenty-nine months.

9

## II.

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## III.

Both Hall and Blunt have presented an array of procedural and substantive challenges to their convictions. We will address their arguments separately.

### A.     Earl Hall

Earl Hall appeals the District Court's denial of his motion for severance and denial of his motion for judgment of acquittal. We review a district court's decision to deny a severance motion for abuse of discretion. *United States v. Boscia*, 573 F.2d 827, 832 (3d Cir. 1978). "In reviewing orders denying severance . . . , this Court must first determine from the record, as it existed when the motion was made, what trial developments were then reasonably foreseeable, and in that light decide whether the district court abused its discretion in denying the severance motion." *United States v. McGlory*, 968 F.2d 309, 340 (3d Cir. 1992). "[E]ven if the district court abused its discretion in denying the severance motion, the defendant must pinpoint 'clear and substantial prejudice' resulting in an unfair trial." *Id.* "It is not enough to show that severance would have increased the defendant's chances of acquittal." *Id.*

Federal Rule of Criminal Procedure 14 provides that a court may sever the trial of criminal codefendants "[i]f the joinder of . . . defendants . . . or a consolidation for trial appears

to prejudice a defendant."[1] Fed. R. Crim. P. 14. "[T]he federal system prefers joint trials of defendants who are indicted together because joint trials promote efficiency and serve the interests of justice by avoiding . . . inconsistent verdicts." *United States v. Urban*, 404 F.3d 754, 775 (3d Cir. 2005). The Supreme Court has underscored the high bar that must be satisfied to set aside that preference. "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). The resulting prejudice from such a situation must be "clear and substantial" and must result in a "manifestly unfair trial."[2] *Urban*, 404 F.3d at 775 (quoting

---

[1] As a general matter, relevant evidence may cause unfair prejudice when it has an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one. . . . In reaching a decision whether to exclude on grounds of unfair prejudice, consideration should be given to the probable effectiveness or lack of effectiveness of a limiting instruction." Fed. R. Evid. 403 advisory committee's note to 1972 proposed rules.

[2] The Government argues that we should determine whether severance is necessary using the test introduced in *Boscia*, 573 F.2d at 832, and reiterated in *United States v. Davis*, 397 F.3d 173, 183 (3d Cir. 2005) (the "*Boscia* factors"). Under the *Boscia* factors, a trial court must consider "1) the likelihood of codefendants testifying, 2) the degree to which such testimony would be exculpatory, 3) the degree to which the testifying defendant can be impeached, and 4) judicial economy." *Davis*, 397 F.3d at 183. However, as evidenced by

11

*United States v. Palma-Ruedas*, 121 F.3d 841, 854 (3d Cir. 1997), *rev'd on other grounds sub nom United States v. Rodriguez-Moreno*, 526 U.S. 275 (1999)). In *Zafiro*, the Supreme Court noted that "[s]uch a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." 506 U.S. at 539.

Here, the risk that the Supreme Court foresaw in *Zafiro* has manifested. Hall moved for severance at multiple points in the trial proceedings based on evidence that could only be admitted through Blunt's testimony, which she had already confirmed in her own motion papers that she planned to give. Hall first filed his Severance Motion and a brief in support of that motion prior to trial, which described the prejudicial and not otherwise available evidence that he believed Blunt would submit to the jury. He also quoted Blunt's own brief in support of her Severance Motion in which she confirmed that she would be submitting the exact testimony that Hall described in his motion. At that point, it should have been reasonably foreseeable to the District Court that Blunt would offer testimony against Hall that was prejudicial and would not be

the second factor, this test typically has been used to evaluate a request for severance on the ground that a co-defendant, who would not testify in a joint trial, would present exculpatory evidence for the moving defendant in a separate trial. *See id.*; *see also Boscia*, 573 F.2d at 832 (developing the test in a case where a co-defendant planned to offer exculpatory evidence). Here, Hall requested severance to prevent a co-defendant from presenting prejudicial and incriminating testimony against her spouse, the moving defendant, in a joint trial. Therefore, *Boscia* and its progeny are inapposite.

12

otherwise admitted, necessitating the severing of their trials. His motion was denied without a hearing.[3]

Hall again submitted an oral motion for severance when Blunt began to testify consistent with her statements in her initial Severance Motion. Again, the District Court denied the motion. It instead issued a limiting instruction that curtailed Blunt's testimony on the issue of reporting Hall's offenses to law enforcement.

Had Blunt's subsequent testimony been similarly or more extensively curtailed, the prejudice to Hall might not be so significant as to warrant a reversal. However, the trial transcript is rife with Blunt's testimonial evidence against Hall, much of which was prejudicial against him and would not have been admitted if Hall had been tried alone and Blunt had been able to exercise her spousal privilege. As Blunt foretold in her Severance Motion, she testified that Hall had threatened her safety; told her there would be problems if she did not comply with his request; threatened that "he was going to kill us" and "bring harm to our family"; and chipped her tooth when he pushed her. Blunt App. 793. These descriptions of threatened and actual violence clearly would tend to elicit an inappropriate emotional response from the jurors, resulting in unfair prejudice. *See* Fed. R. Evid. 403. We therefore conclude that

---

[3] Given the prejudicial nature of Blunt's statements with regard to Hall that both defendants previewed in their Severance Motions, the better protocol in this case would have been for the learned District Court to hold a robust hearing prior to trial in which it could elicit the full extent of Blunt's relevant testimony.

13

Blunt's testimony created a clear and substantial prejudice in the minds of the jurors.

Blunt's testimony did not only prejudice Hall from an emotional standpoint. By way of her testimony, the Government was able to support its contention that Hall was the speaker on all the recorded phone calls to various government entities, save the call in which Blunt admitted to impersonating Shawnta Williams. First, it elicited Blunt's confirmation that she had the MagicJack application installed on her cell phone. With that foundation, it was able to enter Blunt's MagicJack call log into evidence. From there, the Government confirmed that Blunt's phone—camouflaged by the MagicJack application—was used to place the recorded phone calls and that Hall had access to Blunt's phone during the period in which the fraudulent calls were placed. Finally, Blunt identified Hall as the speaker on all but one of the recorded phone calls. Her testimony, coupled with the admitted MagicJack log, is exactly the kind of evidence that the Supreme Court cautioned against in *Zafiro*—that is, evidence that otherwise would not have been admitted at Hall's trial given Blunt's representation in her Severance Motion that she would exercise her spousal privilege in the event that their trials were severed.

At the end of trial, Hall moved for a mistrial. As grounds, Hall's counsel argued, "I had prior to trial moved for a motion to sever based on antagonistic defenses and I think that kind of culminated in [Blunt's] closing with all the references to duress directly related to Mr. Hall, evidence that would not be admissible in a separate trial." Blunt App. 903. At this point, the District Court had the full benefit of the trial record as described above. The prejudice against Hall, both from an emotional and evidentiary standpoint, as a result of

14

Blunt's testimony had been made clear. Even if we afford the District Court the latitude implicit in an abuse of discretion review and determine that it did not abuse its discretion in denying Hall's pre-trial motion for severance, we are compelled to hold that the District Court abused its discretion in denying Hall's motion for a mistrial on the basis of his severance argument. Thus, for the reasons described above, we will reverse the District Court's denial of Hall's motions for severance, vacate Hall's conviction and sentence, and remand the case with the instruction that the District Court grant Hall's motion for severance.

In light of our holding, we need not reach the District Court's denial of Hall's motion for judgment of acquittal. The issue will be dismissed as moot.

### B.    Renita Blunt

Blunt raises five issues on appeal: (1) whether the District Court abused its discretion in denying Blunt's motion for severance; (2) whether the District Court erred by denying Blunt's request for a jury instruction on the defense of duress; (3) whether Blunt's conviction for aggravated identity theft should be vacated on inadmissible- or insufficient-evidence grounds; (4) whether Blunt's conviction for conspiracy to commit mail fraud should be vacated on insufficient evidence grounds; and (5) whether the District Court erred in its determination of the loss amount attributable to Blunt.

We review Blunt's appeal of the District Court's denial of her Severance Motion under the standard set forth in Part III.A, *supra*.

With regard to Blunt's Severance Motion, we are confronted with the issue of whether co-defendant spouses being tried jointly are required to have their case severed when one spouse must decide between testifying adversely against her spouse in her own defense or exercising her privilege against adverse spousal testimony. Here, we are compelled to afford the holder of spousal privilege the opportunity to exercise that privilege without being forced to choose between it and the fundamental right to testify on her own behalf. *See United States v. Ammar*, 714 F.2d 238, 257 (3d Cir. 1983) ("Testimony essential to a spouse's criminal defense must be permitted even if it discloses privileged communications. A severance may be granted for a co-defendant spouse, if necessary to protect his or her rights."). Thus, we will reverse the District Court's decision denying Blunt's Severance Motion solely on the ground that Blunt should be given the opportunity to exercise her spousal privilege without being forced to choose between said exercise and testifying in her own defense.[4]

---

[4] It bears mentioning that courts have not reached a consensus on whether a waiver in one case is limited only to that case—e.g., "selective" or "limited" waiver—or if it results in a permanent waiver with regard to subsequent cases. *See, e.g.*, *United States v. Artates*, No. 12-00826-02, 2013 WL 321574, at *2 (D. Haw. Jan. 25, 2013) (finding that a husband who would testify against his wife in his own trial "would have waived any privilege as to that evidence and could not hide behind the privilege in the subsequent trial of his wife").

While our Court has not spoken to this issue, and need not do so here, it is worth noting that we have rejected the

It is a longstanding tradition in our jurisprudence that a witness has the right to assert or waive spousal privilege when given the opportunity to testify against her spouse. *Trammel v. United States*, 445 U.S. 40, 52 (1980) ("[T]he witness-spouse alone has a privilege to refuse to testify adversely; the witness may be neither compelled to testify nor foreclosed from testifying."). While our Court has not squarely addressed the issue of spousal privilege in the context of a criminal trial in which the spouses are co-defendants, analogous cases suggest that we should afford it significant protection. In *In re Malfitano*, 633 F.2d 276, 280 (3d Cir. 1980), we recognized that a wife may refuse to testify against her husband before a grand jury even when she is alleged to be involved in the charged crime. We grounded our holding in public policy concerns, namely, that the social benefits of marriage counsel against creating strife in a marriage by compelling a witness to

"limited" or "selective" waiver doctrine in other privilege contexts. *See, e.g.*, *Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1426 (3d Cir. 1991) (rejecting the limited or selective waiver doctrine in the context of attorney-client privilege). However, in *In re Malfitano*, 633 F.2d 276, 279 n.5 (3d Cir. 1980) we distinguished attorney-client communications from adverse spousal testimony on the basis that the former prioritized adherence to confidentiality while the latter prioritized the preservation of a marriage. Therefore, it is unclear under our precedent whether the waiver of spousal privilege in one trial would amount to a full waiver, which would compel the witness-spouse to testify in any subsequent trial. For Blunt, this unsettled law provides an additional strategic wrinkle in that she may still be compelled to testify against Hall in his trial if she first testifies against him in her own. However, that is not one of the issues before us today.

testify against her spouse. *Id.* at 278–80. Later, in *Ammar*, we noted that a severance may be granted to a co-defendant spouse in order to protect her right to testify in her own defense.[5] 714 F.2d at 257.

Blunt clearly was compelled to waive her privilege and testify in her own defense at trial. She stated in her initial motion for severance that she was being made to choose between preserving her spousal privilege and providing exculpatory testimony on her own behalf. At a pre-trial conference, she stated to the District Court that she would be compelled to raise a "mutually antagonistic defense" of duress in her trial testimony due to Hall's refusal to stipulate to certain facts prior to trial. At trial, Blunt did indeed testify in her own defense. However, even after being compelled to choose to exercise her right to testify over her right to exercise spousal privilege, Blunt was prevented from exercising fully her right to testify in her own defense. Her testimony was curtailed in an attempt to prevent the jury from hearing prejudicial statements

_____

[5] *Ammar* ultimately held that the marital communications privilege—distinct from the adverse spousal testimony privilege—contains an exception for communications pertaining to ongoing or future criminal activity involving both spouses. Such an exception does not apply here. As we explained in *Ammar*, "The privilege against adverse spousal testimony, which prevents one spouse from being compelled to testify against the other, rests with the testifying spouse, who may choose to waive it. This privilege . . . applies to all testimony of any kind. In contrast, the marital communications privilege prevents a testifying spouse from disclosing confidential communications between the spouses." 714 F.2d at 258.

18

against Hall. For example, Blunt's counsel proffered at sidebar that Blunt would testify that she intended to report Hall's suspicious activities to a federal special agent. That testimony—implying a fear so severe that Blunt planned to reach out to law enforcement—would have probative value with regard to her duress defense, but its admission was prohibited due to the likely prejudice to Hall. In sum, Blunt was entitled to exercise both of the rights at issue here, but she ultimately was unable to exercise either in a satisfactory manner.[6] We therefore will reverse the District Court's denial of Blunt's Severance Motion.

We now turn to Blunt's argument that the District Court erred in denying her request for a jury instruction on the defense of duress. Because we are vacating Blunt's conviction and sentence, we need not address the substance of her argument on this point. We note only that, should Blunt testify fully at her severed trial and raise this request once more, the District Court should consider anew whether the defense is available in light of her unencumbered testimony.

Blunt's remaining challenges to the District Court's rulings all relate to her conviction and sentence for various offenses. Because we are vacating Blunt's conviction and sentence and remanding her case to the District Court for trial severance proceedings, the challenged rulings have been

_____

[6] Again, the District Court would have benefitted from a robust pre-trial hearing in which Blunt's relevant testimony could have been elicited in full. The hearing would have put the District Court on notice of the testimony on which Blunt intended to rely, foreshadowing the conflict between Blunt's right to testify in her own defense and Hall's right to a trial free of unwarranted prejudice.

rendered immaterial. We therefore see no reason to address them here and dismiss them as moot.

## IV.

For the foregoing reasons, we will reverse the District Court's denial of Hall's Severance Motion and Blunt's Severance Motion. We will vacate Hall's and Blunt's convictions and sentences, and we will remand the case to the District Court with the instruction that it grant Hall's motion for severance and Blunt's motion for severance on the grounds provided in this Opinion. We will dismiss as moot the parties' appeals of the District Court's denial of Hall's motion for judgment of acquittal; its denial of Blunt's request to instruct the jury on the defense of duress; its denial of Blunt's motion for a directed verdict on the charges of aggravated identity theft and conspiracy to commit mail fraud; and its determination of the loss amount attributable to Blunt.