982 F.2d 262
 UNITED STATES of America, Appellee,
v.
Rodney ALEXANDER, Appellant.
UNITED STATES of America, Appellee,
v.
Emmanuel G. LEEPER, Appellant.
UNITED STATES of America, Appellee,
v.
George Eugene ROBERTS, Appellant.
UNITED STATES of America, Appellee,
v.
Michael ROBERTS, Appellant.
UNITED STATES of America, Appellee,
v.
Charles Boston JONES, Appellant.
 Nos. 92-1261, 92-1264, 92-1269, 92-1270, and 92-1272.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 16, 1992.
Decided Dec. 9, 1992.
 
 Lee Lawless, St. Louis, MO, argued, for appellant Alexander.
 Lawrence A. Baerveldt, St. Louis, MO, argued (Daniel V. O'Brien, on the brief), for appellant Leeper.
 Joseph Abraham, Jr., El Paso, TX, argued, for appellant Roberts.
 Jeff S. Allder, El Paso, TX, argued, for appellant Jones.
 Edward J. Rogers, St. Louis, MO, argued (Stephen B. Higgins and Edward J. Rogers, on the brief) for appellee.
 Before McMILLIAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and WOLLMAN, Circuit Judge.
 BRIGHT, Senior Circuit Judge.
 
 
 1
 Rodney Alexander, Emmanuel G. Leeper, George Eugene Roberts, Michael Roberts and Charles Boston Jones appeal their convictions for conspiring to possess marijuana with the intent to distribute it and to distribute marijuana. Michael Roberts and Charles Jones also appeal their conviction for distributing marijuana.
 
 
 2
 Collectively, appellants argue their convictions should be reversed and remanded for retrial and/or resentencing because: (1) the district court erred in relying on speculation and hearsay in its determination of the quantity of marijuana involved in the offense; and (2) the district court erred in failing to require the jury to determine the quantity of marijuana involved in the offense.
 
 
 3
 Individually, defendant Rodney Alexander argues his conviction should be reversed and remanded for retrial and/or resentencing because: (1) the prosecutor improperly requested before the jury that he submit to a urine and/or blood test; (2) the district court erred in failing to make separate findings for each participant as to the quantity of marijuana to which each conspirator agreed and the quantity that was reasonably foreseeable by that participant; and (3) the district court found as a matter of law that it lacked the power to depart below the applicable guideline range and therefore erroneously refused to consider a departure. The trial court sentenced this defendant to 151 months (12 years, 7 months), plus five years supervised release.
 
 
 4
 Defendant Emmanuel G. Leeper argues his conviction should be reversed and remanded for retrial and/or resentencing because: (1) the district court found as a matter of law that it lacked the power to depart below the applicable guideline range and therefore erroneously refused to consider a departure. Leeper received the same sentence as Alexander.
 
 
 5
 Defendant George Eugene Roberts argues his conviction should be reversed and remanded for retrial and/or resentencing because: (1) the district court incorrectly set George Roberts' base offense level based on the amount of marijuana attributable to him during his involvement in the conspiracy. He received the same sentence as Alexander and Leeper.
 
 
 6
 Defendant Michael Roberts argues his conviction should be reversed and remanded for retrial and/or resentencing because: (1) the district court incorrectly set Michael Roberts' base offense level based on the amount of marijuana attributable to him during his involvement in the conspiracy; and (2) the district court erroneously determined Michael Roberts' role in the offense as that of an organizer or leader. He received two concurrent 245 month (20 years, 5 months) sentences with two concurrent terms of five years supervised release.
 
 
 7
 Defendant Charles Boston Jones argues his conviction should be reversed and remanded for retrial and/or resentencing because: (1) he was prejudiced by the jury's inability to compartmentalize the evidence; (2) the district court erred in denying a mistrial after the prosecutor's comment that the confidential informant would submit to a drug test if the defendants would do so; and (3) the district court improperly applied the Sentencing Guidelines as to the quantity of marijuana attributable to Jones. He received two concurrent 151 month (12 years, 7 months) sentences with two concurrent terms of five years supervised release.
 
 
 8
 We affirm the convictions, but remand the sentences for reconsideration.
 
 I. BACKGROUND
 
 9
 On November 7, 1990, James Volner was arrested when he attempted to purchase roughly $200,000 worth of marijuana. In exchange for a recommendation of a ten-year cap on his sentence, he agreed to cooperate with DEA officials in identifying and securing the arrest of others involved in marijuana trafficking. Volner testified as follows. He was introduced to Michael Roberts in June of 1984 in El Paso, Texas. Roberts sold him sixty pounds of marijuana, and Volner hired someone to drive the marijuana to St. Louis. In July of 1984, Volner returned to buy 150 pounds, but actually purchased only eighty pounds because the remainder of the marijuana was wet. Roughly once a month from July to December, Volner would return to El Paso to buy quantities of marijuana. In December of 1984, Volner bought 350 pounds, but felt that the quality was poor and withheld payment. Volner found another supplier and purchased 200 pounds from him.
 
 
 10
 In January or February of 1985, Michael Roberts and Rodney Alexander visited Volner's home in Missouri to collect the money for the December shipment. Volner paid Roberts $45,000 and later that spring returned the remainder of the poor quality marijuana.
 
 
 11
 Roberts continued to supply Volner with marijuana, now taking responsibility for delivery in St. Louis. Some time after June of 1985, on two occasions Roberts and Alexander delivered 200 pounds to Volner. Volner refused the first shipment because it was wet.
 
 
 12
 In March of 1986, Volner purchased 125 pounds, and in October of 1986 he visited El Paso and purchased twenty pounds, which he drove back to St. Louis.
 
 
 13
 In 1987, Volner received shipments of roughly 200 to 400 pounds from Michael Roberts, delivered by his father, George Roberts, or Ken Sutton. Volner had no record of the quantity or frequency of these shipments.
 
 
 14
 In April of 1988, George Roberts delivered 400 pounds from Michael Roberts to Volner. On April 28, 1988, George Roberts was arrested in Louisiana for possession of marijuana. After the arrest, the quantities involved in the transactions increased to between 700 and 900 pounds. The marijuana was transported to the Dallas area, where it was transferred and taken to St. Louis. In the Dallas area, the marijuana would be stored at times on a farm and at times at Emmanuel Leeper's residence.
 
 
 15
 Using a 1989 date book, Volner testified that he received 700 pounds in February of 1989, 600 pounds in July of 1989, 220 pounds in October of 1989, and 250 pounds in December of 1989. Charles Jones, Alexander's step-father, made the July, October and December deliveries.
 
 
 16
 Jones made two deliveries for Michael Roberts to Volner in 1990 of an unidentified amount in April and 220 pounds in October.
 
 
 17
 On November 7, 1990, Volner was arrested when he attempted to buy marijuana from federal drug agents. He agreed to cooperate, and on November 8, 1990 taped a telephone conversation with Michael Roberts in which Volner told Roberts that he lost the money for the October shipment. Roberts stated that Jones was "on the road." On November 30 and December 2, 5, 6 and 11, Volner made taped calls to Roberts. In those calls, Roberts referred to the quantities supplied and prices of his source and to Jones' return to El Paso and inability to load his truck on December 6.
 
 
 18
 On December 12, 1990, a DEA agent accepted a delivery of 480 pounds from Jones at a truck stop in Missouri.
 
 
 19
 On December 13, Volner taped a call to Michael Roberts in which Roberts stated he would send Alexander to Dallas to collect payment for the shipment. On December 17, he taped another call in which they discussed the payment, and Roberts gave Volner Leeper's work telephone number.
 
 
 20
 A federal agent called Leeper and arranged to meet. In the evening of December 17, Leeper was arrested after agents spotted in the bed of his truck four boxes, which were found to contain approximately 150 pounds of marijuana.
 
 
 21
 Michael Roberts spoke with Volner's wife on December 18, and on December 27, 1990, Roberts and Alexander flew to St. Louis and attempted to contact Volner. On December 29, 1990, Roberts and Alexander were arrested in Arnold, Missouri. Jones was arrested on December 30, 1990.
 
 
 22
 In mid-December of 1990, Tom Kannaday, in exchange for a grant of immunity, agreed to provide information regarding his involvement in the marijuana business. He testified that he received and stored in his residence 200 pounds of marijuana from Michael Roberts in 1987. Later that year, he stored an additional 400 pounds that was delivered by George Roberts. He saw three more loads of at least 400 pounds each delivered in George Roberts' truck and three loads of 200 pounds each delivered in Ken Sutton's car. He further testified that "Max" made at least five deliveries to Virginia of at least 400 pounds each.
 
 
 23
 Kannaday further testified that he received marijuana from "Jay" (including a 150 pound delivery in New Mexico) and Leeper. On five occasions, he collected a total of at least 1,380 pounds and saw 1,000 pounds at Leeper's residence. Kannaday also transported currency payments to Michael Roberts on several occasions for a total of $1,535,000. He testified that at the time Roberts was selling marijuana for between $600 and $625 per pound.
 
 
 24
 On January 25, 1991, Alexander, George Roberts, Michael Roberts and Jones were indicted for conspiracy to possess marijuana with the intent to distribute it and to distribute marijuana. Michael Roberts and Jones were also charged with distribution of marijuana.
 
 
 25
 On March 27, 1991, a superseding indictment was filed, in addition charging Leeper with conspiracy to possess marijuana with the intent to distribute it and to distribute marijuana.
 
 
 26
 All defendants entered pleas of not guilty, and after a jury trial, all were convicted as charged. Following the sentencing hearing, the trial court imposed the sentences already described in this opinion.
 
 
 27
 This timely appeal followed.
 
 II. DISCUSSION
 A. Separate Trial
 
 28
 Jones argues he was prejudiced by the district court's failure to grant him a separate trial. He claims to be an innocent, unknowing courier, and asserts that testimony including numerous references to the loading of vehicles over the course of the conspiracy prejudicially went to the essence of his defense. In illustration of the claimed prejudice, he mentions an incident during jury deliberations in which the jury requested "Tape, Jones' involvement with Mike Roberts that Roberts will put on Jones' truck." 3 Trial Tr. at 205. The judge and attorneys could not identify the tape.
 
 
 29
 We hold the trial court acted within its discretion in denying a separate trial. As the Government notes, it is rarely improper for coconspirators to be tried together. To establish an abuse of discretion, Jones must demonstrate he was "prejudiced by the jury's inability to follow the trial court's instructions and to 'compartmentalize the evidence' as it related to the separate defendants." United States v. Lee, 886 F.2d 998, 1002 (8th Cir.1989) (quoting United States v. Adkins, 842 F.2d 210, 212 (8th Cir.1988)). Jones has failed to show prejudice, given the precise and specific evidence of his participation in the conspiracy and the existence of several tapes fitting the jury's description.
 
 B. Prosecutorial Misconduct
 
 30
 During the trial, the prosecutor responded to a request that the government witness take a drug test with a statement that he would "stipulate if everybody will take drug tests we'll--." 2 Trial Tr. at 156. The defendants' attorneys protested the implicit shifting of the burden of proof to the defendants. The district court took no action until the next day, when it attempted to cure the misconduct, instructing the jury "I think at the close of the day there was some comment between some--some dialogue between Mr. Rogers and Mr. London on drug testing. The jury will disregard those comments and I'm instructing you to disregard those comments, and I think that's enough, between Mr. London and Mr. Rogers." 2 Trial Tr. at 231. The defendants argue the prosecutorial misconduct had a substantial and highly prejudicial effect and the instruction to the jury, coming a day later and incorrectly identifying the attorneys involved in the exchange, failed to rectify the shift of the burden to the defendants.
 
 
 31
 The prosecutor acted improperly. The trial court took appropriate corrective action. The trial court has broad discretion in determining whether an allegedly improper question has tainted a trial to such an extent as to require a mistrial. United States v. Robinson, 774 F.2d 261, 277 (8th Cir.1985). We reject this assignment of error.
 
 C. Sentence Enhancement for Leadership Role
 
 32
 Michael Roberts asserts the district court erroneously determined his role in the offense as that of an organizer or leader. He claims the Government failed to show he had more decision-making authority, claimed a right to a larger share of the fruits of the crime, or exercised control and authority over the others.
 
 
 33
 Here, the Government provided substantial evidence of Roberts' leadership role. More than five individuals were involved in the conspiracy, and they served as subordinates to Roberts. Alexander and Robert Henry, another participant who worked with Alexander, both identified Michael Roberts to Kannaday as their boss. Kannaday, Ken Sutton, Max and George Roberts all worked as drivers for Michael Roberts. Michael Roberts' wife and Leeper both collected payments for Roberts. Leeper lived in a house purchased by Michael Roberts to serve as a transfer point for shipments. Roberts established the price Volner paid for the marijuana. The district court received adequate evidence to identify Roberts as a leader of the conspiracy.
 
 D. Quantity Determinations and Sentencing
 1. Hearsay
 
 34
 The defendants contend the district court erroneously relied on speculation and hearsay in determining the quantity of marijuana involved in the offense. They argue the testimony of the government witnesses was admitted guessing and approximation as to the frequency and quantity of the shipments. The witnesses were involved with other drug conspiracies during the same time period and were personally involved in extensive drug usage, possibly confusing the witnesses' recollections. Further, the witnesses in some instances relied on the testimony of others not involved in the proceedings.
 
 
 35
 As the Government points out, the district court based its quantity determinations on testimony from the specific recollection of witnesses who were subject to cross-examination. The witnesses testified on the basis of first-hand observation, personal recollections, and in Volner's case from written records for 1989. Volner testified that he was present when loads had been weighed, and Kannaday testified that he was paid based on the weight he transported. The district court's determination was thus not based on hearsay.
 
 2. Total Quantity Involved in Conspiracy
 
 36
 Although we hold the district court's determination of quantity was not based on hearsay, we must still address the defendants' concerns about the speculative nature of the evidence. Contrary to the defendants' assertion that they are entitled to a jury determination of quantity, the Eighth Circuit clearly holds that the quantity of drugs involved in an illegal transaction is relevant only to the sentence that will be imposed and is not part of the offense, and thus need not be decided by the jury. United States v. Wood, 834 F.2d 1382, 1390 (8th Cir.1987). A district court's decision on the amount of drugs for which a defendant is to be held accountable is a finding of fact that must be accepted by a court of appeals unless clearly erroneous. United States v. Walton, 908 F.2d 1289, 1301 (6th Cir.), cert. denied, 498 U.S. 990, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990).
 
 
 37
 The witnesses' testimony often was vague as to the number of deliveries and quantities of marijuana. The district court gave no explanation as to how it arrived at the figure of 22,000 pounds, so it is difficult to determine on appeal if the district court committed a clear error. While the witnesses' vagueness perhaps did not rise to the level of unreliability of the government witnesses in United States v. Simmons, 964 F.2d 763 (8th Cir.1992), the computation remains questionable.
 
 
 38
 The defendants contend the Government presented substantial evidence only regarding the three seizures involving Jones, Leeper and George Roberts. The net weight of Jones' seizure was 419 pounds and that of Leeper's seizure was 149.6 pounds. The gross weight of George Roberts' seizure was 321 pounds, and thus the total proved net weight would be roughly 850 pounds. Michael Roberts argues that in determining the amount of marijuana involved in the conspiracy, the prosecutor failed to establish clearly the dates and amounts of the transactions. He argues that from Volner's and Kannaday's testimony, only the following amounts can be established:
 
 
 39
 Summer 1984 60 pounds
One month later 80
December 1984 350
After June 1985 200
March 1986 125
October 1986 20
April 1988 300
April 28, 1988 321
February 1989 700
July 1989 600
October 1989 220
December 20, 1989 250
October 1990 250
December 12, 1990 480
December 17, 1990 150
 -----
 4,106 pounds (1,866 kilograms)
 
 
 40
 Because the district court did not provide a description of how it reached the quantity of 22,000 pounds, we are unable to review whether the determination was clearly erroneous. We remand the case for specific findings and reconsideration on the issue of the quantity of drugs and the appropriateness of the sentences.
 
 3. Foreseeability to Each Defendant
 
 41
 Alexander, Jones and George Roberts contend the district court inaccurately determined the quantity of drugs foreseeable by them in the course of the conspiracy. Alexander argues the Government's evidence merely showed he was present with Michael Roberts at Volner's home in January of 1985, when Kannaday delivered money to Robert Henry in El Paso, and when Henry delivered marijuana to Kannaday in New Mexico in 1987 or 1988. Kannaday understood Alexander was no longer involved with Roberts' organization in 1988, although Alexander was arrested with Michael Roberts in St. Louis in December of 1990. In addition to these facts, however, the evidence also showed that in 1985, Alexander, while armed, accompanied Michael Roberts to collect a payment from Volner and on at least two occasions when marijuana was brought to Volner. In a recorded telephone conversation, Michael Roberts told Volner that he would send "Rodney" to Leeper's to collect a payment. Alexander also received money from Kannaday in Michael Roberts' name. Faced with this evidence, the district court did not clearly err in finding the entire quantity of drugs, as determined on remand, to be foreseeable to Alexander.
 
 
 42
 Jones argues that his involvement in the conspiracy began, at the earliest, in July of 1989 and no evidence exists to establish the foreseeability to him of quantities of marijuana delivered prior to that date. Nevertheless, once he began his involvement, he transported large sums of money from Volner to Michael Roberts and thus reasonably could have foreseen that large quantities were delivered prior to his entry into the conspiracy. Further, he is Alexander's step-father, and the evidence suggests they shared a residence. As with Alexander, the district court did not err in finding Jones responsible for the entire quantity of drugs, as that quantity may be redetermined on remand.
 
 
 43
 George Roberts argues he is accountable only for the marijuana distributed from the time of his entry into the conspiracy "sometime in 1987" until his arrest on April 28, 1988. Volner could not establish clearly either the dates of the deliveries or the quantities delivered during this period. Roberts contends that for sentencing purposes, the district court should have considered only the 300 pounds of marijuana Volner testified he received in April of 1988 and the 321 pounds seized after George Roberts' arrest, or a total of 282 kilograms. The Government argues that George Roberts was accountable for at least 2,700 pounds of marijuana he delivered to Volner in addition to the 321 pounds seized subsequent to his arrest, or 3,021 pounds (1,373 kilograms). The district court held Roberts accountable for 5,000 pounds, but failed to explain the basis of its finding. Because we are thus unable to decide whether this finding was supportable, we remand for a redetermination of the quantity of drugs foreseeable to George Roberts.
 
 E. Power to Depart
 
 44
 Alexander and Leeper argue the district court was under a mistaken belief that it had no power to depart downward from the guideline range because the grounds for departure--lack of criminal history, tangential role in the conspiracy, employment history, and family situation--were already considered by the guidelines. They contend the district court did not consider a departure and deny it, but mistakenly concluded it had no power to depart and refused to consider it.
 
 
 45
 In light of our determination to remand the sentences, we do not reach this issue. On remand, the district court may reconsider the request for a downward departure and whether on the facts such departures are warranted in the district court's discretion.
 
 III. CONCLUSION
 
 46
 We affirm the convictions, but remand for specific findings and reconsideration on the issue of the quantity of drugs and for possible redetermination of the appropriate sentences.